UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| E.T. PRODUCTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:13CV424-PPS |
| | ) | |
| D.E. MILLER HOLDINGS, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In the 1970's, Doug Miller founded a business manufacturing and selling fuel additive products and lubricant products. In recent years, the family business, known as E.T. Products, was split into two parts, and Petroleum Solutions became the name of the lubricant business. When Doug was ready to retire in 2010, he sought buyers for E.T. Products and Petroleum Solutions. E.T. Products was sold first, to a group of investors led by Thomas Blakemore. Petroleum Solutions was then sold to John Kuhns. E.T. brought this action against Doug Miller and his son Tracy, as well as against the Millers' holding company, contending that the assistance they offered to Kuhns in his running of Petroleum Solutions constituted a breach of the restrictive covenants and non-competition provisions to which the Millers agreed. The Millers have filed their own lawsuit against Blakemore. That case was consolidated into this case and the matter is now before me on cross-motions for summary judgment.

**Factual Background**

As usual, I'll start with the undisputed facts. Doug Miller is 72 years old. He is married to Dana Miller and they have a son, Tracy Miller. Doug founded E.T. Lubricants Co., Inc. in 1977. The company manufactured both fuel additives and lubricants, and its name was later changed to E.T. Products Co. On January 1, 2009, in order to divide the business into two constituent parts, Doug and Dana purchased the lubricant assets and formed a new company called Petroleum Solutions, Inc. The new lubricants business included a few accounts that also purchased fuel additive products, and Petroleum Solutions supplied those customers with E.T.'s fuel additives. The two companies are located across a parking lot from one another.

In 2010, Doug decided to retire and sell both of the businesses. Tom Blakemore and his group of investors bought E.T. for $4,950,000.00 via an Asset Purchase Agreement on January 4, 2011, but weren't interested in Petroleum Solutions. Blakemore was aware that the Millers continued to operate Petroleum Solutions, which Blakemore didn't see as a competitor to E.T. because Petroleum Solutions did not make fuel additives. In fact, after the sale of E.T. to the Blakemore group, Petroleum Solutions continued to be a customer of the now Blakemore-owned E.T., buying $30,000 to $40,000 of its products each year to distribute to Petroleum Solutions' customers who wanted fuel additives as well as lubricants.

As part of the sale of E.T. Products, Doug and Tracy Miller were required to sign identical covenants not to compete which prohibited them from engaging in "the

Business" of blending, packaging, marketing and selling chemical fuel additive products. These covenants are what is at the heart of this case. Here is the language of the restrictive covenant from Section 7.11(b) of the Asset Purchase Agreement:

> Each of the Restricted Parties hereby agrees that for a period commencing on the Closing Date and ending five years from the Closing Date and so long as Purchaser has complied with its obligations under the Note and this Agreement (the "Restricted Period"), subject to Section 7.11(g), each of the Restricted Parties shall not, **directly or indirectly, as agent, employee, consultant, distributor, representative, equity holder, manager, partner or in any other capacity, ... operate, manage, control, engage in, invest in ... or participate in any manner in, act as a consultant or advisor to, render services for (alone or in association with any Person), or otherwise assist any Person**, other than Purchaser and its Affiliates, **that engages in or owns, invests in, operates, manages or controls any venture or enterprise that directly or indirectly engages in the Business** anywhere in North America (the "Territory").

[DE 70-4 at 27-8 (emphasis added).] The "Business" is defined in the APA's Recitals this way: "Seller is engaged in the business of blending, packaging, marketing and selling chemical fuel additive products, with its primary focus on diesel fuel additives (the 'Business')." [*Id.* at 3.]

A year after the sale of E.T., Doug Miller sold Petroleum Solutions to John Kuhns on January 1, 2012. Petroleum Solutions continued to be a customer and distributor of E.T. fuel additive products. From January to April, 2012, Tracy Miller provided software training to Kuhns for approximately 4 to 5 hours per week. Tom Blakemore was aware that Tracy was providing that training to Petroleum Solutions, and expressed no objection at the time.

3

Sometime in 2012, Tom Blakemore presented John Kuhns with an agreement containing a non-compete provision, which Kuhns was unwilling to sign. Thereafter, E.T. stopped supplying product to Petroleum Solutions. After E.T. severed its relationship with Petroleum Solutions, Doug notified John Kuhns that he would "continue to help you in a consulting fashion with lubricants, but will be unable to help with any fuel additive business," saying that he did not want to violate his non-compete agreement with E.T. Products. [DE 70-7 at 2.]

At the time of the sale of E.T. Products to Blakemore's group, the Millers took a note in the amount of approximately $2.7 million. Blakemore paid on that note until July 2013, when the Millers agreed to accept a discounted amount as payment in full for the sale of E.T. Products. E.T. signed a General Release in favor of the Millers but specifically excepted from the release were any claims for violation of the restrictive covenant signed by the Millers.

So for all intents and purposes, the parties should have been done with one another in July 2013. The Millers were handsomely paid off, and Blakemore had the company. But matters went awry in September 2013, when Blakemore accused Doug Miller of improperly soliciting an E.T. Products customer in direct violation of the terms of the covenant not to compete that he had signed. This accusation has since fallen out of the case. E.T. Products have been unable to substantiate the charge that Miler was trying to poach its customers. In any event, Blakemore suspected that Miller was trying to contact his customers, and that's when the lawsuits started flying. Miller

struck first with a suit in state court claiming that Blakemore had violated the General Release. Blakemore countered with a federal lawsuit alleging violation of the restrictive covenant. As noted above, the cases have since been consolidated.

## Discussion

There are two principal issues to decide on the pending motions for summary judgment. The first is whether the restrictive covenant signed by the Millers are even enforceable. The second is, if they are enforceable, whether the Millers actually violated the covenant by providing assistance to Kuhns.

### **Is the Covenant Not to Compete Enforceable?**

The Millers contend that the geographic scope of the covenant — covering all of North America — is too broad. It is true that covenants not to compete are disfavored in the employment context. But they are less so in the context of a sale of a business. *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005). "For a variety of reasons, covenants not to compete ancillary to the sale of a business stand in better stead." *Id*. at 687. These reasons include the equality of bargaining power between the parties and the premium often paid for an agreement not to compete with the buyer. *Id*. Generally, reasonable noncompetition agreements are enforceable, and Indiana courts "have historically enforced reasonable restrictions, but struck unreasonable restrictions, granted they are divisible." *Id*.

The reasonableness of the non-compete agreement is a question of law for the court to decide. *Central Indiana Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 729 (Ind. 2008).

5

A leading Indiana case, *Fogle v. Shah*, 539 N.E.2d 500, 503 (Ind.App. 1989), gives a three-part rubric for "determining whether covenants not to compete ancillary to the sale of a business are overbroad." The three considerations are: (1) whether the non-compete provision is broader than necessary for the protection of a legitimate interest of the buyer; (2) the effect of the agreement's limitations on the seller; and (3) the effect of the covenant on the public interest, which includes consideration of the reasonableness of the limitations as to time, prohibited activities and geography. *Id*. Of "primary importance" are the reasonableness of the protection of the buyer's legitimate interest and the reasonableness of the time, geographical and activity restrictions. *Id.*

The Millers rely on cases analyzing non-competes in the more disfavored employment context, rather than in the more pertinent context of the sale of a business. Covenants not to compete in the employment context are strictly construed, in part, because of the imbalance in bargaining power between the parties. Most employees are told to "take it or leave it" when they are presented restrictive covenants. But those types of restrictive covenants have no bearing on a situation where two sophisticated businessman negotiate the sale of a $5 million business. Viewed in the proper context, I find that the limitations agreed to by the Millers were a reasonable protection of Blakemore's legitimate interest in maintaining and expanding E.T.'s customer base.

Blakemore wanted not only to buy the Millers' business, but to buy the Millers *out of* business, so that they would no longer be players on the scene, and he paid nearly $5 million to achieve that goal. Indiana courts recognize that in such situations a seller

is often paid a premium not to compete with the buyer, and a broad non-compete may be necessary "'to assure that the buyer receives that which he purchased.'" *Dicen*, 839 N.E.2d at 67, quoting *Alexander & Alexander, Inc. v. Danahy*, 488 N.E.2d 22, 28 (1986). *Fogle* notes that the "size of the purchase price is an indication of both the necessity for, and the intention that there should be, a substantial period of freedom from competition."*Id.*, 539 N.E.2d at 504. "Often a large part of the value paid and the principal inducement for paying a high price, consists in the protection afforded by a covenant not to compete." *Id.*

Blakemore purchased E.T. with plans for considerable expansion, which have proved to be realistic and show that the continent-wide geographical scope of the non-compete limitations was reasonable. "The person who purchases a business with the purpose of extending its scope is entitled to bargain with the seller against competition within the territory into which he plans to extend it." *Fogle*, 539 N.E.2d at 503. Blakemore "anticipated significant growth in the fuel additive business as a result of recent environmentally driven legislation." [DE 73-1 at ¶8.] Blakemore and his investors were aware that E.T. Products had "excess capacity," that is the ability to produce higher volumes of product. [*Id.* at ¶13.] Blakemore owned another business in the same industry, making coolant for diesel engines, with a worldwide distribution footprint. [*Id.* at ¶¶16-20.] Indeed, with that connection, Blakemore, as the buyer of E.T., has succeeded in his plans to establish relationships with two major truck stops, so that within the first year of the new ownership, E.T.'s products were sold in all 50 states

and within the second year, 7 Canadian provinces. [*Id*. at ¶¶25-28.] So the continental scope of the restrictive covenant was reasonable given ET's expansion plans.

At this point I need to take a brief detour to discuss some evidence that I considered in arriving at this conclusion. I have relied on an affidavit submitted by Blakemore which sets forth what his intent was relating to the expansion of E.T. Products prior to his purchase of the company from the Millers. The Millers have moved to strike the affidavit as an improper attempt to offer extrinsic evidence in an effort to vary the terms of an agreement. But Blakemore's testimony about the plans for the business is not offered to modify the terms agreed to, but to allow me to judge (as I must in this context) the reasonableness of what was agreed to. I consider the buyer's intentions and the basis for them in determining whether the "area [the agreement] embraces is not greater than that which the parties *may fairly anticipate* the extended business will cover." *Fogle*, 539 N.E.2d at 504 (emphasis added). So I have fully considered Blakemore's affidavit, and the motion to strike it will be denied.

There are additional considerations that support the reasonableness of the non-compete. At age 72, Doug Miller planned to retire, so that there was presumably no unreasonable impact on Doug as the seller to be restricted as to his activities in "the Business." The nature of the business also supports the reasonableness of the geographic scope. *Fogle*, 539 N.E.2d at 504. As a production and distribution business, as opposed to a services business, E.T.'s footprint is not necessarily localized and

geographic expansion was reasonably possible. Indeed, the Millers don't dispute that at the time of the sale, E.T. already had one customer in Canada.

The restrictive covenant here clearly has a broad scope of prohibited activities, including acting as an agent, employee, consultant, distributor, representative, advisor, or otherwise rendering services for or assisting any person engaged in the Business. [DE 70-4 at 27-8 (emphasis added).] The long list is entirely consistent with E.T.'s intention to buy the Millers out of the business of fuel additives altogether, at least for the five-year Restricted Period (the length of which is not contested). The Indiana Court of Appeals gave broad effect to, without questioning as unenforceable, a similar non-compete with a "nearly exhaustive list of roles in which (seller) is prohibited from acting as a competitor" and "in any other competitive capacity." *Kuntz v. EVI, LLC*, 999 N.E.2d 425, 430 (Ind.App. 2013).

In sum, the Millers had considerable personal goodwill with their customers, and Blakemore paid handsomely to buy them out of the business, with their promise to stay out. Having considered all the factors relevant to the inquiry, I am persuaded that the restrictive covenant was reasonable in its scope and all its particulars, and is enforceable against Doug and Tracy Miller, and their company.

**Did the Millers Violate the Restrictive Covenant?**

Although I have found that the restrictive covenant is enforceable, I also find as a matter of law that E.T. has failed to demonstrate that the Millers violated it. To show that the Millers violated the covenant, E.T. has to establish that Doug and Tracy rendered

assistance to Petroleum Solutions, and that Petroleum Solutions was at the time of the assistance "directly or indirectly engage[d] in the Business" of fuel additives. Recall that the term "in the Business" is defined in the agreement to be "the business of blending, packaging, marketing *and* selling chemical fuel additive products." I have emphasized the word "and" to make clear that the definition is in the conjunctive not the disjunctive.

To be "in the Business" of fuel additives, Petroleum Solutions would need to be doing all of the following: blending, packaging, marketing and selling fuel additives. Just selling such products as a distributor, for example, would not be "in the Business" under the terms of the non-compete agreement. This may seem like an overly rigid reading of the covenant, but Indiana law requires covenants, even in the sale of business context, to be "strictly construed against the covenantee." *Fogle*, 539 N.E.2d at 502. *See also Dicen*, 839 N.E.2d at 688 ["Though the covenant is reasonable in light of the admitted evidence, it is still construed against the preparing party."]

How are the Millers alleged to have violated the non-compete? E.T. identifies the following conduct by the Millers as violating the restrictive covenant:

- Doug financed Kuhns' purchase of Petroleum Solutions, co-signing his line of credit, and giving him a below-market lease;
- Doug consulted with Petroleum Solutions for the first year on the manufacture and blending of lubricants and this, E.T. speculates, somehow enabled Petroleum Solutions to blend fuel additives as well;

- Doug introduced Petroleum Solutions to the company's customers and suppliers for both lubricants and fuel additives, and also made some deliveries for Petroleum Solutions;

- Doug was the go-between for Petroleum Solutions' hiring of a salesman who was terminated by E.T.; and

- Tracy trained Kuhns on company software for 4 to 5 hours a week for four months after the sale of Petroleum Solutions.

All of this conduct occurred in the first year after the sale of Petroleum Solutions to Kuhns, when there is absolutely no evidence that Petroleum Solutions' involvement with fuel additives went further than being a distributor of E.T.'s own fuel additive products. Petroleum Solutions was certainly not blending fuel additives; nor were they packaging fuel additives. So they weren't "in the Business" of fuel additives as that phrase is defined in the APA. And if Petroleum Solutions was not "in the Business" then the Millers were permitted to assist Petroleum Solutions to their heart's content.[1]

E.T. nonetheless argues that Petroleum Solutions was *indirectly in* "the Business" of fuel additives. E.T. says it is "undisputed that PS was indirectly engaged in the Business" [DE 78 at 8] because in the first year after the sale, Petroleum Solutions sold $109,0000 of fuel additives. But it did so as E.T.'s distributor! As noted, there is no

---

[1] The fact that Petroleum Solutions was in the related business of lubricants is neither here nor there. There is a difference between the lubricant business and the business of fuel additives, and the restrictive covenant was limited to the latter.

11

evidence that at the time of the sale to Kuhns, Petroleum Solutions was blending fuel additives. [DE 70-3 at 36:22-37:2.] And there is no evidence that Petroleum Solutions even now is blending its own fuel additives, as opposed to merely distributing such products manufactured by others. By the end of the briefing of E.T.'s motion for summary judgment, E.T. is left to flatly contend that "the circumstances under which the Millers sold Petroleum Solutions to Kuhns constitute a violation of the APA." [DE 78 at 9.] But I'm at a loss to see how.

The fact that Petroleum Solutions distributed E.T.'s fuel additive products did not make Petroleum Solutions even "indirectly" in the Business of "blending" such products.

Moreover, the restrictive covenant's use of "indirectly" is so indefinite as to threaten unreasonable overbreadth unless given some reasonable construction. To repeat, covenants not to compete, being in restraint of trade, are to be "strictly construed against the covenantee." *Fogle*, 539 N.E.2d at 502. Here, where the hook relied upon by E.T. for Petroleum Solutions' "indirect" engagement in the Business of fuel additives is the sale of E.T.'s own product, the hook doesn't bear the weight given to it. It makes no sense to claim, as E.T. does, that Petroleum Solutions' selling of its products was somehow anti-competitive to E.T.'s interests and therefore in violation of the covenant. How could selling E.T.'s products be harmful to E.T.? If anything, it is more apt to describe this as *assisting* E.T. "and its Affiliates," which is conduct specifically excepted from the restrictive covenant in §7.11(b). [DE 70-4 at 27-8.] Furthermore, once the relationship between Petroleum Solutions and E.T. Products ended, Doug Miller, out of

an abundance of caution, ceased helping Petroleum Solutions for fear that he might violate the restrictive covenant.

The parties identify no disputed facts material to the determination whether the Millers violated their agreements not to compete with E.T. On the undisputed facts, a reasonable jury could not conclude that the conduct identified by E.T. constituted assistance to an enterprise that was directly or even indirectly engaged in the Business of blending, packaging, marketing and selling chemical fuel additive products. The restrictive covenant does not reach so far as to prohibit Doug and Tracy's assistance to Petroleum Solutions for the brief period when Petroleum Solutions was a distributor of E.T.'s own products. On the claim of breach of that agreement, summary judgment is granted in favor of the Millers.

**The Millers' Complaint Against E.T. Products**

As noted above, this is a consolidated case, into which the Millers' separate suit against E.T., originally filed in state court, has been merged. After being removed to this court, the Millers' complaint in Cause No. 2:13cv446 was consolidated into this lower-numbered case on February 6, 2014. In their complaint, the Millers allege that Blakemore's threatened legal claims, articulated in a September 2013 letter, were without merit and were waived by the July 2013 release, and that the threat of suit constituted a breach of that release.

The release was given in connection with E.T.'s prepayment of the balance owed on the Promissory Note associated with the Blakemore group's purchase of the business.

The release contained a "Covenant Not to Sue," covering "any matter or thing whatsoever arising out of the matters covered by this General Release (specifically excluding the Non-Competition Agreements)." [DE 71-11 at 2.] The letter dated September 16, 2013 from E.T.'s counsel to the Millers' attorneys contained the text of the restrictive covenant in §7.11 of the APA and alleged that the Millers had "clearly violated the non-compete provisions." [DE 71-12 at 3.] The letter advises the Millers that E.T. had instructed the law firm "to pursue any and all legal remedies available, including the initiation of legal action seeking injunctive and other relief against Miller, Kuhns, and their respective companies." [*Id.*]

E.T. seeks summary judgment on the Millers' complaint on the ground that the release on which the Millers' claims are based "specifically excluded claims related to the restrictive covenants contained in the APA and the non-competition agreements with the Millers." [DE 72 at 18.] Because the release did not bar claims for violation of the non-compete provisions, and that was the nature of the claims threatened in the letter (and ultimately pursued by E.T. in court), the Millers have no viable claim for breach of the release. Furthermore, the Millers' lawsuit predated the filing of E.T.'s action here in federal court. So any allegation of a violation of a covenant not to "sue" was premature, as no suit had been brought by E.T. against the Millers at that time.

The Millers' brief attempt to defend their claims is weak and unsuccessful, merely invoking additional "facts" that they say justified the filing of their complaint, namely that E.T. had earlier sued Petroleum Solutions and Tom Patton (E.T.'s former employee

14

who'd been hired by Petroleum Solutions), and that Tom Blakemore had elsewhere threatened litigation in person and in email. [DE 74 at 22-23.] These facts have no bearing on whether the July 2013 letter threatening non-compete claims breached the release that did not cover non-compete claims. Summary judgment is granted in favor of E.T. on both counts of the Millers' complaint, and E.T.'s counterclaim will be dismissed without prejudice.

## Conclusion

My summary judgment determinations are that neither E.T. nor the Millers prevail on their opposing claims against one another. What should have been a positive transition in the lives of Mr. Miller and Mr. Blakemore devolved instead into a needless expenditure of resources on dubious legal claims that spawned two years of fruitless litigation. After all the time, trouble, angst, anger and expense, both sides will go home without a victory.

**ACCORDINGLY:**

Plaintiff E.T. Products, LLC's Motion for Partial Summary Judgment [DE 71] is DENIED in part, as to the remaining Miller defendants' liability on E.T.'s complaint in No. 2:13cv424, but GRANTED in part, in favor of defendant E.T. as to its liability on the Miller plaintiffs' complaint in No. 2:13cv446.

The remaining Miller defendants' Motion for Summary Judgment [DE 69] is GRANTED with respect to plaintiff E.T.'s complaint in No. 2:13cv424.

Defendants' Motions to Strike [DE 76 and 79] are DENIED.

The Clerk shall enter judgment in these consolidated cases as follows. On the complaint of E.T. Products, LLC against remaining defendants D.E. Miller Holdings, Inc., Douglas Miller and Tracy Miller, summary judgment shall be entered in favor of the defendants. On the complaint of D.E. Miller Holdings, Inc., Doug Miller and Tracy Miller against E.T. Products, LLC (consolidated from No. 2:13cv446), summary judgment shall be entered in favor of defendant E.T. Products, and the counterclaim shall be dismissed without prejudice. Upon the entry of judgment, this case shall be CLOSED.

ENTERED: January 4, 2016

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**